# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Samuel Der-Yeghiayan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7811 | **DATE** | 2/27/2004 |
| **CASE TITLE** | Unique Envelope Corp vs. GSAmerica Inc | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion, the Court finds in favor of Unique on its breach of contract claim against GSA (Count I), its breach of contract claim against Rosenberg as the alter ego of GSA (Count II), and the fraud claim against Rosenberg (Count III). The Court hereby directs the Clerk of Court to enter judgment in favor of Unique, and against GSA and Frank Rosenberg, jointly and severally, in the amount of $391,486.73. The Court further directs the Clerk of Court to enter Judgment of dismissal in favor of Unique and against GSA on GSA's counterclaims. In addition, the Court grants Unique's motion for Rule 37 expenses [96-1] and awards Unique $13,207.50 from Rosenberg. All pending dates and motions are hereby stricken as moot. Terminating case. Enter Memorandum Opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | MAR 01 2004 | | |
| ✓ | Docketing to mail notices. Memorandum Opinion distributed in open Court. | CLERK, U.S. DISTRICT COURT | date docketed | 102 |
| | Mail AO 450 form. | on FEB 27 AM 3: 46 | | |
| | Copy to judge/magistrate judge. | FILED-ED 10 | docketing deputy initials | |
| MW | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice | |
| | | | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNIQUE ENVELOPE CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00 C 7811 |
| | ) | |
| GS AMERICA, INC., and FRANK | ) | |
| ROSENBERG, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| GS AMERICA, INC., | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNIQUE ENVELOPE CORP., et al., | ) | |
| | ) | |
| Counter-Defendants. | ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

Plaintiff Unique Envelope Corp. ("Unique") filed the instant action against Defendants

GSAmerica, Inc. ("GSA") and Frank Rosenberg ("Rosenberg") alleging

a breach of contract claim against GSA, a breach of contract claim against Rosenberg as an alter

ego of GSA, and a fraud claim against Rosenberg. Unique seeks compensatory damages,

prejudgment interest, punitive damages, and attorneys' expenses and fees. Defendant GSA filed

a counter-claim against Unique alleging four Counts containing breach of contract claims, four

Counts containing fraudulent inducement claims, three Counts containing misrepresentation

1

claims, a negligence claim, and a tortious interference with contract claim. GSA seeks
compensatory damages including consequential, prospective, and exemplary damages against
Unique. GSA also seeks pre-judgment interest, post-judgment interest and attorneys' fees. A
bench trial was conducted in this case on January 15, 2004 through January 23, 2004. We have
reviewed all admissible evidence in this case and enter the following findings:

## FINDINGS OF FACT

### I. Jurisdiction

Unique Envelope Corp. ("Unique") and all of the Defendants are citizens of
different states and the amount in controversy exceeds $75,000.00, exclusive of interests and
costs. Plaintiff Unique is an Illinois corporation, with its principal place of business in Chicago,
Illinois. Defendant GSAmerica, Inc. ("GSA") is a Tennessee corporation and during the relevant
time periods, GSA's principal place of business was located in Tennessee. Defendant Rosenberg
is a citizen of Tennessee.

### II. Unique Envelope Assignment

Unique is in the business of manufacturing and supplying standard and custom made
envelopes, printing, and lithographic services to commercial clients for use in their respective
business enterprises. Unique was incorporated on November 12, 1998. Melvin Kozbiel operated
Unique as a sole proprietorship until December 31, 1998. Melvin Kozbiel assigned to Unique all
of the claims brought against GSA and Frank Rosenberg ("Rosenberg") in this lawsuit.

2

### III. Transactions Between the Parties

In 1996, GSA began purchasing envelopes from Unique. Payments for envelopes purchased by GSA during 1996 and 1997 were due within 30 days of the invoice date. Based upon a meeting in June of 1997 in Chicago between Rosenberg, John Burns and Darrell Kozbiel an agreement was reached regarding envelope orders for 1998. Under the agreement payments for non-Christmas card envelopes would be due within 90 days of the invoice date. For all envelopes purchased for the T.V. Allen and Empress lines of Christmas greeting cards, 30% of the invoice would be due within 90 days of the invoice date, and the remainder would be due on January 10th of the following year. At the time of the June, 1997 meeting, GSA was suffering from severe cash flow problems. At no time prior to or during 1998 did Defendants ever disclose to Unique that GSA was having cash flow problems. Although GSA was consistently late in making payments to Unique, it had, prior to June of 1998, eventually paid all amounts due.

During 1998, GSA ordered envelopes from Unique, but failed to pay for all the invoices. The total amount due on unpaid invoices for envelopes shipped to GSA by Unique is $195,450.62. Throughout 1998, GSA had issued blanket purchase orders to Unique for certain types of envelopes which were specially manufactured by Unique for the blanket purchase orders. These specially manufactured envelopes could not be resold by Unique to third parties and the total price for envelopes ordered but not paid for by GSA pursuant to blanket purchase orders is $34,485.92.

In 1997, at the request of Rosenberg, Darrell Kozbiel traveled to Los Angeles to appraise certain envelope manufacturing equipment ("Crane Equipment") and he appraised it in the range of $25,500 to $47,500. During this same period, GSA was negotiating a transaction whereby it

3

would purchase the assets of the T.V. Allen division of Crane & Co., Inc. ("Crane"), and the Crane Equipment that Darrell Kozbiel appraised was one of those assets. After such visit and appraisal, Rosenberg asked Darrell Kozbiel if Unique would like to make an offer for the Crane Equipment and in response Unique offered $38,500 for the Crane Equipment and offered to add $10,000 to its bid price if it obtained $1,000,000 in envelope orders from GSA. GSA accepted Unique's offer of $48,500 for the Crane Equipment. However, GSA failed to purchase at least $1,000,000.00 worth of envelopes from Unique.

During 1996, 1997, and 1998 GSA experienced severe cash flow problems and GSA's 1997 audited financial statements included a statement by the company's auditors indicating that there was "an uncertainty about the Company's ability to continue as a going concern." In 1997, Rosenberg and John Burns began contacting GSA suppliers in an attempt to extend the terms which GSA had with such suppliers because GSA was experiencing severe cash flow problems. On October 15, 1997, GSA caused its subsidiary, Empress Greeting, Inc. ("Empress Greetings") to purchase from Crane the assets of Crane's T.V. Allen Division even though GSA did not have sufficient capital for Empress Greetings to purchase the T.V. Allen Division's assets from Crane. Rosenberg participated on behalf of GSA in the negotiations for the purchase.

In January, 1998, GSA was past due on the amounts it owed to Unique. As a result, Darrell Kozbiel called Dana Crooker, a GSA employee, and told him that Unique was stopping shipments until all past due amounts were paid. Within minutes after Darrell Kozbiel's telephone call to Dana Crooker, both Dana Crooker and Rosenberg telephoned Darrell Kozbiel. Rosenberg asked Darrell Kozbiel how GSA could get Unique to resume shipping. Darrell Kozbiel told Rosenberg that GSA needed to pay all past due amounts and the next day Unique received a

4

check via overnight delivery from GSA for all past due amounts.

In a letter on GSA letterhead dated January 22, 1998, Rosenberg asked Darrell Kozbiel to contact Jack Wilton ("Wilton"), a GSA employee, the next time GSA fell behind on payments. Wilton was GSA's production manager during most of 1998 and as such, he had personally dealt with Darrell Kozbiel at Unique regarding the ordering and delivery of envelopes, and had personal knowledge of the orders placed with Unique.

In January, 1998, Rosenberg communicated on behalf of GSA with Starr Toof Printing Company ("Starr Toof") regarding a potential business combination between the two companies (Exhibit 14). In that communication, Rosenberg stated that GSA would not allow a merger of the corporate structure of GSA since it involved personal holdings and other relationships that GSA reserved the right to liquidate, including accounts receivable, payable, and other hard assets. In communications with Starr Printing, Louis Rosenberg, GSA President, and the son of Rosenberg, confirmed that GSA's corporate shell could not be part of any transaction because it was important to the personal holdings and tax structure of his father Frank Rosenberg and Don Sundquist (Exhibit 13). Rosenberg's goal at the time was to consolidate the value of GSA with the profits of publishing companies owned by Vestmark, Inc. ("Vestmark") which is a holding company which invests in printing and publishing companies. Rosenberg was, during the relevant time periods, a shareholder, director and officer of Vestmark. Rosenberg founded Vestmark, and was an integral part of its operations. Rosenberg controlled the decisions of the Vestmark Board of Directors. Between 1998 and 2000, Rosenberg received cash payments from Vestmark totaling approximately a quarter of a million dollars. In addition to Rosenberg's active involvement with various companies, his personal business was also intertwined with GSA and

its operations. Rosenberg controlled the decision of the board of directors of T.V. Allen. Even after Rosenberg's involvement in the transactions relating to GSA, T.V. Allen and Unique, he continued to actively participate in the business affairs of T.V. Allen. For instance he took an active role in the sale of assets of T.V. Allen to Four Seasons in August of 1999 as is illustrated by Exhibit 82.

In 1998, Rosenberg directed GSA to take certain "corrective steps." which included the following: (a) Restructuring GSA's stock ownership to give Rosenberg 7% of GSA's stock; (b) Granting Rosenberg and Don Sundquist options for 240,000 shares of stock, at an exercise price of $4 per share; and (c) Authorizing Rosenberg to negotiate and close the sale of 50.5% of Empress Greetings stock to a group led by John Bobango. The Executive Committee of the Board of Directors of GSA resolved to adopt the above directives. Rosenberg and other investors had previously (in 1994) sold all of their GSA stock back to the corporation. In exchange, Rosenberg and the other investors received promissory notes, which they then assigned to the Rosenberg-Sundquist Trust. Rosenberg and Don Sundquist were the Trustees of the Rosenberg-Sundquist Trust. Rosenberg was also the owner of 81% of the beneficial interest of the trust. The notes held by the Rosenberg-Sundquist Trust from GSA were not secured by GSA's assets. The principal amount of the notes was approximately $798,000.

Although Rosenberg acted on behalf of GSA with vendors and potential business partners, he was not an officer or employee of GSA in 1997 or 1998 and he retired from GSA's Board of Directors on March 17, 1998. However, notwithstanding his official "retirement," Rosenberg executed a Memorandum of Understanding on April 6, 1998 between GSA and Starr Printing, concerning an extension of credit by Starr Printing to GSA and Rosenberg signed on

behalf of GSA.

By the spring of 1998, GSA could not support the cash flow needs of both GSA and Empress Greetings. Specifically, GSA was not able to pay the employees and vendors of both entities. In May, 1998, a new corporation called the T.V. Allen Company ("T.V. Allen") was incorporated for the purpose of running the T.V. Allen business and marketing and selling the T.V. Allen lines of Christmas cards. Rosenberg and his family owned approximately 28% of T.V. Allen. The organizational meeting of the T.V. Allen shareholders took place in the office of GSA on July, 9, 1998. Rosenberg was "acting Chairman" during the organizational meeting of the T.V. Allen shareholders. At the organizational meeting of the T.V. Allen shareholders, T.V. Allen approved the acquisition of the T.V. Allen Assets and the Empress line of cards from GSA. During such meeting, Rosenberg nominated the entire slate of directors for T.V. Allen, which slate was approved. At that meeting, the shareholders recognized that the President of T.V. Allen was also the Chief Executive of GSA, and waived any "apparent conflicting responsibilities and loyalties." Neither GSA's shareholders nor its Board of Directors were ever notified of or approved any conflict resulting from its Chief Executive also serving as T.V. Allen's President.

On July 15, 1998, Rosenberg attended a meeting of the Executive Committee of GSA's Board of Directors. Although Rosenberg was not a director, officer or employee of GSA at this time, he opened the meeting and potential reorganization plans for GSA were discussed. In the summer of 1998, the T.V. Allen Company began using the assets of Empress Greetings, which included the assets of the T.V. Allen Division purchased from Crane (collectively, the "T.V. Allen Assets"). At the time that the new T.V. Allen Company started using the T.V. Allen Assets, sales employees who had worked for Empress Greetings or GSA started working for the

7

new T.V. Allen Company. For a period of time in 1998, these employees worked for the new T.V. Allen Company but were paid by GSA. Beginning in the summer of 1998, GSA took the materials purchased from its vendors, including Unique, packaged them into a final product (mostly boxes of cards and envelopes), and transferred that product to T.V. Allen. T.V. Allen did not make its first payment on a GSA invoice until December 28, 1998. By June of 1999, T.V. Allen had only paid approximately 50% of the amounts it owed to GSA.

In August 1998, GSA transferred to T.V. Allen its print management business for a customer called Community Communications, Inc. ("CCI"). The CCI business would have generated an approximate gross profit of $88,000 for GSA for the last five months of 1998. T.V. Allen paid no consideration to GSA for the CCI business. Defendants did not disclose to Unique the transfer of the T.V. Allen and Empress lines and the CCI print management business to T.V. Allen.

In August of 1998, Cary Johnson ("Johnson") was the outside accountant for both GSA and the new T.V. Allen Company. Johnson had also provided accounting services to Rosenberg personally. In August of 1998, Johnson allocated certain expenses and liabilities between GSA and the new T.V. Allen Company. All such expenses and liabilities had been paid by GSA, and Johnson was determining which expenses and liabilities should be reimbursed by T.V. Allen. Johnson's allocation also included reimbursement to GSA for the T.V. Allen Assets that were being used by the new T.V. Allen Company. Johnson's allocation determined that T.V. Allen owed GSA $2,845,528.22, and of that amount, only $443,420 was to be paid in cash. Ultimately, T.V. Allen paid only $534,412 of the total amount in cash.

By August, 1998, GSA was at least 120 days past due on every invoice it received.

8

GSA's Board of Directors never approved, or even discussed, the transfer of the T.V. Allen Assets to the new T.V. Allen Company. Although Glenn Wimmer ("Wimmer") was GSA's President from June, 1998 through at least December, 1998, he had no involvement in, or personal knowledge of, the use or transfer of the T.V. Allen Assets from GSA to the new T.V. Allen Company. The price that the new T.V. Allen Company was to pay for the T.V. Allen Assets was not finalized until October or November of 1998. Notwithstanding the fact that the new T.V. Allen Company started using the T.V. Allen assets in June or July, 1998, an agreement for the transfer of the T.V. Allen Assets from GSA to the T.V. Allen Company was not executed until November 6, 1998. Just before T.V. Allen started using the T.V. Allen Assets, in May of 1998, GSA had obtained an appraisal of the library of T.V. Allen Christmas card designs that was included in the T.V. Allen Assets (the "Library"). The express purpose for obtaining the appraisal was to arrange for financing. The appraisal valued the Library at over $2,900,000. Both Rosenberg and his son Louis Rosenberg were given copies of the appraisal at the time of its completion. When Johnson assigned a value to the Library for use in the transfer of the T.V. Allen Assets from GSA to T.V. Allen, he valued the Library at approximately $1,800,000 - or over $1,100,000 less than the May, 1998 appraised value.

Defendants did not disclose to Unique the transfer of the T.V. Allen and Empress lines to T.V. Allen. Defendants did not disclose in 1998 to Unique the fact that GSA was transferring products, including the envelopes being shipped by Unique, to T.V. Allen with no payment.

During 1998 and part of 1999, GSA and T.V. Allen shared the same office space and the same telephone number. Lewis Dalton ("Dalton") testified that Vestmark and T.V. Allen also had shared the same office space. Given its financial circumstances, GSA transferred assets to

the new T.V. Allen Company under terms that did not provide an adequate down payment or cash flow. T.V. Allen originally planned on raising approximately $1,800,000 in capital, but only raised approximately $1,300,000. As a result of this $500,000 shortfall, T.V. Allen ultimately paid GSA $500,000 less than originally planned, and GSA had $500,000 less to pay creditors than originally planned. By transferring GSA's assets to T.V. Allen for inadequate consideration and cash, while continuing to use GSA to purchase the materials necessary to supply the T.V. Allen and Empress lines, Rosenberg was able to use GSA's credit to finance the T.V. Allen's business.

By the end of 1998, the transfer of the T.V. Allen Assets from GSA to the new T.V. Allen Company was complete. At this time, however, T.V. Allen had not fully paid GSA for the transferred assets or for the goods purchased from GSA in 1998. At the end of 1998, Rosenberg began corresponding on behalf of the new T.V. Allen Company using T.V. Allen letterhead. Although Rosenberg was not an employee, officer, or director of T.V. Allen at any time during 1998 or 1999, he served as "Acting Chairman" of T.V. Allen Board meetings, actively participated in those meetings, acted on behalf of T.V. Allen in dealings with vendors, and signed contracts on behalf of T.V. Allen concerning the sale of its assets.

During 1998, certain vendors of GSA, including Unique, provided goods that were ultimately used for the T.V. Allen line of Christmas cards ("T.V. Allen Vendors"). Once the transfer of the T.V. Allen Assets to the new T.V. Allen Company was complete, Rosenberg wanted the new T.V. Allen Company to establish a direct relationship with the T.V. Allen Vendors. In order to establish such a direct relationship between the new T.V. Allen Company and the T.V. Allen Vendors, Rosenberg caused T.V. Allen to make payments to many of these

10

vendors for amounts due them from GSA.

Unique stopped shipping envelopes to GSA in October of 1998 because GSA was behind in payments. In order to try and get Unique to renew shipping envelopes to GSA, on or about January 22, 1999, Rosenberg sent Unique a T.V. Allen check in the amount of $50,000 (Exhibit 52) as partial payment for GSA's past due balance. At the time, Rosenberg informed Unique that "[w]e will next year buy directly from Unique our requirements as we have separated our operations from GSA." (Exhibit 53). Rosenberg made several attempts to convince Unique to ship envelopes directly to T.V. Allen for the 1999 season. Although Rosenberg was aware that GSA still owed Unique over $195,000 for unpaid invoices, and that Unique still had envelopes manufactured pursuant to GSA's blanket purchase orders but not shipped, other than the $50,000 Rosenberg sent to Unique, he never paid Unique the amount fully owed.

In January, 1999, Vestmark made a $200,000 loan to Louis Rosenberg ( Rosenberg's son) and William Todd. At the time, Louis Rosenberg was GSA's Chief Executive Officer. In exchange for the loan, Vestmark took a security in the accounts receivable of GSA even though at the time, GSA owed its unsecured creditors approximately $3,500,000.

In February, 1999, Wimmer threatened Rosenberg that he would put GSA into bankruptcy. If GSA filed for bankruptcy, the only collateral that the Rosenberg-Sundquist Trust would have for the $798,000 note it held from GSA was stock certificates. Rosenberg informed his fellow trust beneficiaries that he could prevent a bankruptcy filing by replacing GSA's Board of Directors.

GSA did not file for bankruptcy, but in March, 1999, it sold its remaining operating assets to Starr-Toof. From the cash received from the sale to Starr-Toof, GSA re-paid Vestmark for the

11

$200,000 loan it gave to Louis Rosenberg and William Todd.

In February of 1999, GSA hired Carl Norman ("Norman") to handle the sale of its operating assets to Starr-Toof, and then to serve as independent liquidator for the company's remaining assets. Norman served in this capacity until June of 1999.

As of March 15, 1999, GSA had accounts payable of over $3,500,000, which was owed to approximately 120 creditors. Of the total accounts payable due as of March 15, 1999, Rosenberg agreed to assume responsibility for approximately seven (7) vendors, that were collectively owed less than $500,000.

In April, 1999, GSA began sending letters to its creditors informing them that it had nothing but cash, accounts receivable, and work in process, to satisfy its debts to those creditors. These letters offered the creditors a settlement plan whereby each participating creditor would purportedly receive 40-70% of the amount owed. The letters sent to GSA's creditors stated that the company was indebted to "the prior owners of GSA in the amount of $798,726" and that "notes evidencing the indebtedness were placed in a trust." The letters further stated that the trustee of the trust would receive an assignment of certain "non-cash" assets in exchange for amounts owed. The letters also stated that the trust would receive these non-cash assets after the unsecured creditors had received a minimum of 40% of their claims. The trust referred to in this letter was the Rosenberg-Sundquist Trust. As a result of the representations made in these letters, almost all of GSA's unsecured creditors agreed to the foregoing liquidation plan. As of November, 2001, the unsecured creditors of GSA had only received 32% of their total claims.

Eventually, in a transaction on June 8, 1999 Rosenberg exchanged Vestmark stock for T.V. Allen stock. The value of the T.V. Allen stock that GSA transferred to the

12

Rosenberg-Sundquist Trust was $434,221. In addition, in June of 1999, GSA cancelled a note for $985,116 owed to it by T.V. Allen. In exchange, T.V. Allen issued a note in the amount of $985,116 to the Rosenberg-Sundquist Trust. The new note issued by T.V. Allen, the Vestmark stock, and the T.V. Allen stock, all of which were transferred to the Rosenberg-Sundquist Trust during GSA's liquidation, were the "non-cash" assets referenced in the letter sent to GSA's creditors. Contrary to the representations made in that letter, the Rosenberg-Sundquist Trust received these assets before GSA's other unsecured creditors received the minimum 40% of the amount due to them.

In March, 1999, Rosenberg discovered that there would not be enough cash from sale of assets to Starr-Toof to pay the Rosenberg-Sundquist Trust and he was also aware at this time that the Trust's debt to GSA was not secured by the company's assets, and that it was an unsecured creditor just like GSA's vendors. Thus, Rosenberg knew that the Rosenberg-Sundquist Trust stood in no better position than GSA's other unsecured creditors (including Unique). Despite this, Rosenberg still took assets from GSA worth more than the Trust would have received under GSA's liquidation plan. Upon this discovery, Rosenberg took actions to swap the Trust's note from GSA for GSA's stock in T.V. Allen and its stock in Vestmark as well as for a note that GSA held from T.V. Allen. Between March and June of 1999, GSA transferred assets to the Rosenberg-Sundquist Trust. Such assets included stock in Vestmark, and stock in T.V. Allen. No valuation of the Vestmark and T.V. Allen stock transferred to the Rosenberg-Sundquist Trust was performed at the time. Based upon estimated values provided by Rosenberg and adopted by Vestmark's Board of Directors, the value of the Vestmark stock that was transferred from GSA to the Rosenberg-Sundquist Trust was $532,039.

GSA transferred assets to the Rosenberg-Sundquist Trust as payment towards a note whose face value was $798,000. Because the GSA note held by the Rosenberg-Sundquist Trust was secured only by stock and not by assets, the Rosenberg-Sundquist Trust stood in no better position than GSA's other unsecured creditors. Since the Rosenberg-Sundquist Trust was unsecured, the most it could expect as payment on its note under GSA's liquidation plan was 40-70% of the value, or $367,413 to $642,973. Had the Rosenberg-Sundquist Trust received 32% of the amount owed (as the rest of the creditors did), it would have received only $293,000.

Norman, GSA's independent liquidator, was not involved in the transfer of GSA's Vestmark and T.V. Allen stock to the Rosenberg-Sundquist Trust, nor in the exchange of notes whereby GSA relinquished its $985,000 note from T.V. Allen in exchange for a release of the $798,000 note held by the Trust.

By June of 1999, T.V. Allen had only paid approximately 50% of the amounts it owed to GSA. In April, 1999 Norman began sending letters to Rosenberg demanding that T.V. Allen pay the amounts it owed to GSA for goods it received in 1998. Norman informed Rosenberg that the amounts owed by T.V. Allen represented almost 40% of the total amount that GSA's unsecured creditors could expect to receive in the liquidation. Although Rosenberg made some proposals for the settlement of T.V. Allen's accounts, he failed to follow through on any of those proposals. In May of 1999, Norman informed Rosenberg that a payout to the unsecured creditors of less than 50% would result in protracted creditor litigation followed by bankruptcy. Norman further informed Rosenberg that if T.V. Allen's receivables were not resolved, he would recommend to GSA's Board of Directors that the company file for bankruptcy. A settlement agreement between GSA and T.V. Allen was signed on June 15, 1999 and under the agreement, T.V. Allen Company

14

agreed to pay GSA $528,733.14 in thirty (30) monthly installments, without interest. T.V. Allen's December 31, 1998 Balance Sheet however reflected $1,506,728 payable to GSA. The settlement agreement between GSA and T.V. Allen resulted in a payout to GSA's unsecured creditors of only 32%, which was less than the 50% threshold that Norman felt was necessary to avoid a bankruptcy filing by GSA. Norman left GSA some time in June of 1999.

On June 25, 1999, the T.V. Allen Board of Directors formed a committee of Rosenberg, Johnson, and Lewis Dalton ("Dalton") to investigate and present plans for selling the company. In 1999, Dalton was an officer and outside accountant for Vestmark. He was not a director, officer, employee, or consultant for T.V. Allen. Dalton attended the June 25, 1999 T.V. Allen Board meeting at the request of Rosenberg. He was working on Vestmark business at the time at the offices shared by T.V. Allen and Vestmark. In the Fall of 1999, T.V. Allen sold its greeting card assets to a group including its employees for the price of $1,700,000.

In 1998 GSA was facing severe financial hardships and Wimmer intentionally paid the "minimal" amount necessary to vendors, including Unique, to keep such vendors shipping products to GSA. From June through October of 1998, Wimmer made several payments to Unique for part of the total amount due by GSA. After each such payment, Unique made additional shipments to GSA. Unaware of the goods and assets that were being transferred out of GSA, and in justifiable reliance on the statements and actions taken by Defendants, Unique continued to manufacture and ship envelopes to GSA from June through October of 1998.

One example of Rosenberg's control and dominion over pertinent matters in this case is found in Plaintiff's Exhibit 66 which is a memo from Rosenberg to Don Sundquist and Jeanne Garrett dated April 5, 1999. In the memo, Rosenberg reports on various business actions. He

further orders his attorney to stand by and then states that he called him on a Sunday and summoned him to do his bidding which included the ordering by Rosenberg of the removal of three board members.

IV. Defendant GSA's Counter-claim

Defendant GSA's counter-claim is based on GSA's contentions that the specially manufactured envelopes by Unique for the T.V. Allen line did not contain the proper size of foil. GSA further contends that it suffered damages due to late shipments or no shipments of envelopes by Unique.

When Darrell Kozbiel traveled to Los Angeles at the request of Rosenberg to appraise the Crane equipment, he was shown samples of some of the T.V. Allen envelopes that were being manufactured by Crane. Darrell Kozbiel was not given any samples to take with him at the April, 1997 meeting. Rather, the samples were shown in large books. At the April, 1997 meeting in Los Angeles, Darrell Kozbiel told Richard Adamson, a GSA representative, how Unique would manufacture the T.V. Allen envelopes, if contracted to do so. Darrell Kozbiel drew a sketch for Adamson showing how the envelopes would look.

In a letter to Darrell Kozbiel dated June 10, 1997, Rosenberg stated that Unique would be supplying GSA's envelope needs for 1998 (including the T.V. Allen envelopes). However, GSA did not give Unique any specifications for any envelopes. While GSA provided sample envelopes to Unique in 1997, it never provided any specifications for the size of the foil. Neither did anyone ever inform Unique that the size of the foil was a key issue. On October 21, 1997, Unique provided quotes for the prices it would charge GSA for the T.V. Allen envelopes, should

16

GSA order such envelopes. Prior to providing this quote, Unique had not received any specifications from GSA indicating the size of the foil for the foil-lined envelopes. GSA did not express any concerns to Unique regarding the foil size of T.V. Allen Envelopes until August, 1998.

In a conversation with Crooker, Darrell Kozbiel explained exactly how Unique planned to manufacture the T.V. Allen envelopes, should GSA order such envelopes from Unique. In late 1997, Crooker, a GSA employee, asked Darrell Kozbiel for samples of the T.V. Allen envelopes. Crooker asked Unique to send the samples no later than February of 1998. Darrell Kozbiel informed Crooker that Unique would have to make the samples by hand, since it was cost prohibitive to manufacture so few envelopes on the machines. At the time Crooker asked for samples, Unique had no commitment from GSA for the purchase of any T.V. Allen envelopes. Therefore, Unique could not be expected to order the materials necessary to run the envelopes on the machines at that time, nor manufacture envelopes which were not yet ordered.

Unique sent samples of the T.V. Allen envelopes on February 6, 1998. After receiving the samples, Wilton called Darrell Kozbiel to ask him why the samples had been made by hand. Darrell Kozbiel repeated that he had to make the samples by hand because he could not run that few envelopes on a machine.

In April of 1998 Louis Rosenberg and Richard Mihalik met with Darrell Kozbiel at Unique's plant. Prior to April of 1998, Unique had received no purchase orders for any T.V. Allen envelopes. Louis Rosenberg and Richard Mihalik wanted to have the meeting in order to assure themselves of Unique's ability to properly manufacture the T.V. Allen envelopes and deliver them on time. Louis Rosenberg wanted assurance that Unique could meet delivery dates.

17

Darrell advised Louis Rosenberg that he would do his best to meet any orders, but that GSA should also be current with their payments.

Beginning in March of 1998, Wilton began communicating with Darrell Kozbiel regarding potential orders for T.V. Allen envelopes. Darrell Kozbiel informed Wilton of the dates that Unique could deliver such envelopes, provided that GSA issued purchase orders in a timely manner. Darrell Kozbiel expressly told Wilton on several occasions that Unique required purchase orders before it would order the materials and begin manufacturing the envelopes. Wilton told Darrell Kozbiel that he would get him purchase orders as soon as he could.

Unique did not receive purchase orders for T.V. Allen envelopes until April 9, 1998 and these purchase orders required delivery only six days later, on April 15, 1998. Upon receiving these purchase orders, Darrell Kozbiel immediately called Wilton and told him that Unique could not possibly deliver the envelopes in that short of a time. Wilton told Darrell Kozbiel that Unique should do the best it could. Unique filled the orders as quickly as it could, filling some of them right away from envelopes it had in stock. Other orders took much longer because it took several weeks to order and receive the materials necessary to manufacture the envelopes.

In addition, the quantities on the April 9, 1998 purchase orders were larger than the quantities discussed previously between Wilton and Darrell Kozbiel. Thus, had Unique ordered material based solely on the initial discussions rather than the required purchase orders, there would not have been enough material to fill GSA's purchase order.

In November of 1998, GSA alleged that certain envelopes were defective and returned them to Unique. Unique gave GSA full credit for all returned envelopes which was less than $10,000. At all times during 1998, GSA had overdue invoices for envelopes for both the T.V.

Allen line of greeting cards, and the non-T.V. Allen line of greeting cards.

As of April 30, 1998, GSA owed Unique approximately $40,000 for invoices that were past due. By the end of July, 1998, GSA was more than 90 days past due on invoices for the T.V. Allen envelopes, and non-T.V. Allen envelopes. On April 28, 1998, in a letter to GSA, Unique asked for 90 day terms on the T.V. Allen and Empress lines (Exhibit 22). However, this request had no effect on Unique's delivery of T.V. Allen envelopes to GSA and Unique did not stop shipping any envelopes to GSA until the end of October, 1998.

During 1998, T.V. Allen had claimed that Christmas Card orders were not shipped, shipped late, or claimed that they were cancelled by its customers. T.V. Allen claimed that the failure to ship timely resulted in chargebacks, markdowns, and lost sales. In June, 1999, T.V. Allen used these alleged chargebacks, markdowns, and lost sales as the basis for reducing the amount it owed to GSA. In June of 1999, T.V. Allen deducted from the amount it owed GSA half of what it claimed were lost sales suffered as the result of late deliveries and non-conforming product. GSA's purported damages were determined solely by the amount that T.V. Allen deducted from its account payable to GSA in June, 1999.

GSA, in turn, has alleged that Unique was the cause of the T.V. Allen orders that were not shipped, shipped late, or cancelled. Sales of the T.V. Allen line of Christmas cards were below expectations in 1998. However, the poor sales were not caused by late deliveries of products, cancellations, or distribution problems resulting from Unique's performance. One cause for the poor sales was that multiple vendors withheld shipments from GSA during the course of 1998 as a result of GSA's failure to pay their invoices in a timely manner. No single reason can be assigned to any given cancelled order or for any particular order that was not

19

shipped. Rather, the problems with no shipments and cancelled orders were the combination of several factors including: late arriving products due to failure to timely pay vendors, inefficient distribution, and a malfunctioning computer system.

Rosenberg retained A.J. Geis ("Geis") to serve as GSA's expert in this litigation. Geis' assignment was to give an expert opinion of Unique's role in delivery problems suffered by GSA in 1998. At the time Rosenberg retained Geis to support GSA's counterclaim, Rosenberg knew that Unique did not cause the delivery and sales problems suffered by GSA and T.V. Allen in 1998. Rosenberg had expressly been informed of such in a memorandum dated January 11, 1999. Geis discovered documents that expressly revealed that Unique was not the cause of GSA and T.V. Allen's delivery problems in 1998.

In addition, Wilton had provided Geis certain information which would show that Unique was not the cause of GSA's and T.V. Allen's delivery problems. However, not only did Louis Rosenberg attempt to discredit Wilton, he told Geis not use the incriminating statements made by Wilton in his expert report.

V. Witness Credibility

Plaintiffs' witnesses Darrell Kozbiel, Collette Kozbiel, Melvin Kozbiel, and their expert witness David Nissen were direct, forthcoming, and credible witnesses. Their testimony was consistent. On the other hand, Defendants' witnesses were by and large inconsistent, evasive, and otherwise not credible.

Plaintiff's witness Collette Kozbiel was credible when she stated that Wimmer told her that Rosenberg had sufficient funds to pay Unique and that Wimmer did not know why GSA was

20

not paying. Collette credibly testified that Rosenberg told her to contact Wilton in the future and that when she did so she was rebuked by Wilton. Plaintiffs' expert witness was knowledgeable and presented a logical and unbiased evaluation of Defendants' financial dealings and business practices.

Plaintiffs also called Glen Wimmer, former president of GSA in June of 1998. He was forthcoming and credible. However, his testimony proved that GSA was in financial trouble when ordering envelopes from Unique and he indicated that he would pay just enough to creditors of GSA to have enough oil left over to take care of the next squeaky wheel.

Plaintiffs and Defendants called Frank Rosenberg ("Rosenberg") to testify. Rosenberg attempted to portray himself as an unsophisticated businessman. He also attempted to appear detached from the dealings of GSA and the other relevant corporations. However, the evidence indicates that he was an extremely savvy businessman and that he was actively involved in all aspects of the various companies at issue. Rosenberg also was evasive and non-responsive when questioned by Plaintiff's attorneys about an inconsistency in his testimony or a damaging piece of evidence. However, when questioned by Defendants' attorneys he was cogent and offered detailed testimony relating to his business affairs.

Plaintiffs called Lewis Dalton, a former president of Vestmark, to testify. He was not credible. He gave testimony that conflicted with his deposition testimony.

Plaintiffs and Defendants called Louis Rosenberg, a former president of GSA and the son of Frank Rosenberg. Louis Rosenberg's testimony was unconvincing. On several occasions his testimony conflicted with his prior deposition testimony. He unconvincingly attempted to distance Frank Rosenberg from all business dealings, portraying his father as just another

informal consultant. He admitted that he told Geis, a defense expert witness, to ignore incriminating statements by Wilton. Louis Rosenberg's stated reasons for doing so were unconvincing.

Defendants called Kenneth Patton to testify as an expert. His testimony was unconvincing and illogical. His evaluations were incomplete.

Defendants called Richard Mihalik, a board member of T.V. Allen, to testify. He was not credible. On direct he attempted to portray himself as knowledgeable on various facts in support of Defendants' positions, but on cross examination he contradicted himself and admitted that he lacked personal knowledge regarding key facts addressed on direct. He also gave testimony that was inconsistent with his deposition testimony. For example, on the stand he first indicated that Rosenberg was not actively involved in T.V. Allen board meetings. He denied that Rosenberg controlled the board's decisions. However, after being impeached with deposition testimony, he recanted his assertions and when questioned whether Rosenberg dictated that manner of the meetings, he responded: "Yes I would say that."

## CONCLUSIONS OF LAW

1. There is complete diversity between Plaintiff and Defendants and the amount in controversy exceeds the jurisdictional amount. Therefore, this court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

2. Unique is the proper party to assert and recover under all claims alleged in the First

Amended Complaint, because such claims were properly assigned to Unique by Melvin Kozbiel.

3. GSA failed to pay amounts due for the orders reflected in the invoices and blanket purchase orders, and failed to order $1,000,000 worth of envelopes from Unique Envelope in 1998 and thus breached its contract with Unique. *Chicago Coll. of Osteopathic Med. v. George A. Fuller Co.*, 776 F.2d 198, 209 (7th Cir. 1985).

4. As a result of this breach, Unique has been damaged in the amount of $239,936.54 and Unique is entitled to prejudgment interest at a rate of five percent from January 10, 1999, through entry of judgment, 815 ILCS 205/2, which at 5% is $11,996.83 per year, or $33.32 per day, 815 ILCS 205/10, and from January 10, 1999 through February 26, 2004 amounts to $61,550.19. *See also Jones v. Hryn Development, Inc.*, 778 N.E.2d 245,249-50 (Ill. App. Ct. 2002)(indicating that prejudgment interest can be awarded in equity without the need of statutory authority).

5. Frank Rosenberg ("Rosenberg") exercised complete dominion and control over GSA, not only of finances, but of policy and business practice, such that GSA had no separate mind, will, or existence of its own with respect to Rosenberg's transfer of its assets to other entities that he owned and/or controlled. Rosenberg, rather than GSA's Board of Directors, controlled the transfer of the company's assets to the T.V. Allen Company and to the Rosenberg-Sundquist Trust. GSA did not have a separate mind, will or existence

23

of its own. Rosenberg used his control over GSA to commit fraud and a wrong, and used his control to commit a dishonest and unjust act in contravention of Unique's rights. Rosenberg's control of GSA and his breach of duty proximately caused the unjust monetary loss to Unique. *Cont'l Bankers Life v. Bank of Alamo*, 578 S.W.2d 625, 632 (Tenn. 1979).

Defendants argued at trial that all evidence concerning the period after the Unique transactions is irrelevant. There is sufficient evidence that Rosenberg was actively involved with the affairs of GSA and controlled the affairs during the period in questions. However, evidence of his control after the period in question bolsters the conclusion that he had control during and after the period in question. Evidence relating to his control after the period in question is relevant because it undermines Rosenberg's assertions that he was never actively involved in the business dealings of the above entities and that he retired from GSA. Evidence of subsequent involvement in the pertinent corporation's activities is not absolute proof that Rosenberg was as involved in the affairs during the period on question. However, it does support the inference that Rosenberg was involved in the pertinent business affairs during the period in question, particularly because there is no evidence to explain why Rosenberg would suddenly become actively involved, and such evidence is instructive because it shows that shortly after the period in question there is evidence of Rosenberg's dominion, just as his dominion before during the relevant period, despite the fact that there was no change in his official capacity of the pertinent corporations. There is extensive evidence of Rosenberg's active control over the business affairs of GSA, T.V. Allen, the Trust , and Vestmark before, during, and after the

transactions in question with Unique.

Rosenberg argued vehemently at trial that no Tennessee case has ever found alter ego liability where the alleged alter ego individual was not a director or officer of the shell company. First of all, if the courts' deemed such official participation a prerequisite for alter ego liability, the courts could have specified as much, but they have chosen not to do so. *See Stigall v. Wickes Mach.*, 801 S.W.2d 507, 510 (Tenn. 1990)(stating that "[t]he conditions under which the corporate entity will be disregarded vary according to the circumstances present in each case and the matter is particularly within the province of the trial court."). This case presents the type of scenario that explains why the courts have refrained making such rigid requirements for alter ego liability. For if director or officer membership was a requirement for alter ego liability, individuals such as Rosenberg could unjustly shield themselves from all liability simply by avoiding any open and official declarations of control and dominion.

In this case there is an incongruity regarding Rosenberg's lack of official control over GSA during the relevant period and his actual control. At every turn the hand of Rosenberg appears and his dominion is seen, often in subtle ways, such as for instance the calling of a company attorney to do his bidding on a Sunday and telling him to terminate board members. Rosenberg's behind the scenes decision making, despite his lack of official title at times, and the apparent lack of control and knowledge about the business affairs of GSA by those who were supposedly in charge only serves to emphasize Rosenberg's absolute control and dominion over GSA. This is exactly the type of situation where alter ego liability is appropriate. The courts may disregard the separate

entity of a corporation "upon a showing that it is a sham or a dummy where necessary to accomplish justice." *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1992).

No matter how one analyzes the turns and twists in this web of deceit, it points to an undeniable conclusion: that the ever domineering presence and authoritarian hand of Frank Rosenberg in every business dealing resulted in Unique not getting paid. Frank Rosenberg would have this court believe that he is just an innocent bystander, an observer, and at times, a benefactor. However, the facts paint another story completely. Frank Rosenberg is the business tycoon, the king, the decision maker both in open forums and behind the scenes, who at the stroke of his wand bought and sold companies, transferred stocks, fired undesirable board members or directors, and unilaterally made decisions concerning payments to creditors such as Unique.

6.   The transfers of GSA's assets to T.V. Allen, and subsequently to the Rosenberg-Sundquist Trust were not at arms length, were done for inadequate consideration, and occurred in violation of the rights of Unique, GSA's creditor.

7.   Rosenberg used his control over GSA to defraud Unique of the amounts owed to it for goods shipped to GSA at the same time that assets were being transferred to T.V. Allen. Rosenberg used GSA to purchase goods for use by T.V. Allen. Ultimately, neither T.V. Allen nor GSA could pay for such goods. In effect, Rosenberg used GSA to absorb the liabilities incurred in the start-up of the new T.V. Allen Company. GSA was inadequately capitalized for the purpose of buying the assets of the Crane T.V. Allen Division. The

T.V. Allen Company was inadequately capitalized, and therefore unable to pay for the goods that GSA purchased from Unique and transferred to T.V. Allen.

8. As a result of the foregoing, Frank Rosenberg ("Rosenberg") was the alter ego of GSA and therefore is liable for GSA's breach of contract with Unique and fraud against Unique. *Cont'l Bankers Life v. Bank of Alamo*, 578 S.W.2d 625, 632 (Tenn. 1979); *Electric Power Bd. v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 525-26 (Tenn. 1985) (upholding jury's finding that a subsidiary company was a mere alter ego or instrumentality of its parent where subsidiary was insolvent and owed a large debt to the parent corporation, and the two shared the same officers and office building); *In re B & L Labs, Inc.*, 62 B.R. 494, 505 (Bankr. M.D. Tenn. 1986) (concluding that corporation was alter ego of the defendants, given that they had diverted certain assets from corporation); *Fleming Cos., Inc. v. Rich*, 978 F. Supp. 1281 (E.D. Mo. 1997) (piercing corporate veil where defendant, who owned several grocery stores, compelled several of his stores to order groceries despite the fact that they were insolvent); *Geringer v. Wildhorn Ranch, Inc.*, 706 F. Supp. 1442, 1448-49 (D. Colo. 1988) (piercing corporate veil where defendant dominated and controlled the corporation, used funds from other corporations to make purchases for the resort corporation, and supervised the maintenance of the property in question); *Brown v. Alron, Inc.*, 388 N.W.2d 67, 71-72 (Neb. 1997) (upholding piercing of corporate veil where, among other things, assets were taken from the defendant corporation to pay the obligations of other corporations held by individual defendant); *Boyd v. Boyd & Boyd, Inc.*, 386 N.W.2d 540, 543-45 (Iowa App. 1986)

27

(finding that stockholder who transferred all of insolvent corporation's assets to himself to avoid collection of them by creditors of corporation was alter ego of corporation, where depletion of assets left corporation an empty shell for purposes of collection by debtors and not imposing personal liability would be inequitable).

9.  During the course of 1998, Rosenberg and GSA failed to disclose material facts to Unique relating to GSA's ability to pay for envelopes being ordered and shipped. Specifically, Defendants failed to disclose that: (i) GSA was suffering from severe cash flow problems, and effectively became insolvent by the Spring of 1998; (ii) GSA was transferring the T.V. Allen Assets to a new company called T.V. Allen formed by Rosenberg; and (iii) after June or July of 1998, GSA was taking the envelopes being shipped by Unique Envelope and transferring them to T.V. Allen without payment for those goods.

10. Once GSA became insolvent, the company and its directors had a duty to inform Unique of the transfer of the T.V. Allen Assets. However, GSA not only failed to disclose the foregoing material events, but affirmatively took steps and made statements in order to induce Unique to continue shipping envelopes. Specifically, Wimmer made minimal payments throughout the Summer of 1998 in order to induce Unique to keep shipping. Furthermore, both Wimmer and Louis Rosenberg made false statements to Collette Kozbiel and Darrell Kozbiel indicating that GSA had sufficient cash to pay its bills. At one point, Wimmer who was the president of GSA, told Collette that he did not

know why GSA was not paying Unique because he believed that Rosenberg had the money.

11.    The Defendants omissions and misrepresentations were intended to induce Unique Envelope to keep shipping envelopes to GSA.

12.    As a result of GSA's omissions and misrepresentations, Unique continued to ship envelopes to its detriment, unaware of the fact that GSA would never be able to pay for such envelopes as a result of its transactions with T.V. Allen.   The testimony of Collette and Darrel Kozbiel clearly shows that they reasonably believed GSA was in good financial condition because they had not heard otherwise and GSA continued to place orders.  Rosenberg argued at trial that the Kozbiel's belief that GSA was in sound financial conditions and their expectation that GSA would live up to its bargain after the June 1997 deal was unreasonable given GSA's prior history of untimely payments. However, although GSA was consistently tardy in its payments, GSA had eventually paid all of its debts owed to Unique.

13.    GSA's omissions and misrepresentations constituted fraud against Unique Envelope. *See Tan v. Boyke*, 508 N.E.2d 390, 393 (1987); *Doherty v. Kahn*, 682 N.E. 2d 163, 176 (1997).

14.    Furthermore, Rosenberg directed, controlled and participated in the actions which

constituted the fraud upon Unique, and as GSA's alter ego, Rosenberg is liable to Unique for the damages caused by GSA's fraud. *Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503, 510 (7th Cir. 1997). Rosenberg made the misrepresentations or caused others to make misrepresentations or fail to make necessary representations in order to deceive Unique and get it to continue to do business with GSA. At the time of the fraud Rosenberg knew that assets and funds were being funneled out of GSA and in fact Rosenberg was the instigator of the scheme. As a result of Unique's reasonable reliance they are left with an unpaid debt by Unique and GSA is insolvent and unable to pay the debts owed.

15. Although Unique's April 28, 1998 letter asked GSA to pay all invoices (including invoices for T.V. Allen and Empress Greetings envelopes) within 90 days, GSA did not pay such invoices within 90 days. Furthermore, Unique did not cease shipping envelopes on July 28, 1998, even though GSA had failed to pay all invoices within 90 days. Unique did not stop shipping envelopes until after October 19, 1998, when the total amount owed by GSA reached almost $250,000.00. Therefore, Unique Envelope's April 28, 1998 letter was not a breach of any terms of any contract with GSA, and even if it were, such breach caused no damage to GSA.

16. The financial difficulties faced by GSA and T.V. Allen in 1998 such as lost sales, cancellations and chargebacks were caused by numerous factors, including: poor sales, late arriving product, inefficient distribution, and a malfunctioning computer system. The

late arriving product was the result of GSA's failure to pay its vendors in a timely manner, causing several of them to withhold shipments. No single reason can be assigned to any cancelled order or any particular order that was not shipped by GSA to a T.V. Allen customer. GSA has failed to establish that it suffered damages relating to the counterclaim. Furthermore, even if could establish damages, GSA has not provided evidence showing the cause of each of its alleged damages. In addition, GSA has failed to produce reliable evidence upon which a damage figure for the counter-claim could be reasonably calculated. Also, GSA failed to prove that there was an agreement that Unique had to manufacture the envelopes with a specific configuration of foil and failed to prove that the foil lined envelopes specially made by Unique were contrary to the terms of the contract. Unique was forthcoming and candid in its dealings with GSA regarding deadlines, manner of production, and the quality and types of products expected to be manufactured by Unique pursuant to GSA orders. Therefore, we find that Unique did not breach its contract with GSA, commit fraud against GSA, or commit any of the other alleged wrongful conduct listed in the counterclaim. To the contrary the counterclaim had no merit whatsoever.

17. GSA breached its contract with Unique and therefore Unique is entitled to damages for the total amount due on unpaid invoices for envelopes shipped to GSA by Unique which is $195,450.62, the total amount for envelopes ordered but not paid for pursuant to blanket purchase orders which is $34,485.92, and the additional $10,000 paid by Unique for the Crane machine in exchange for the promise by GSA to give Unique one million

dollars worth of business, which GSA failed to do. The total amount is $239,936.54. We also grant prejudgment interest totaling $61,550.19.

18.     Punitive damages serve the dual purpose of deterrence and retribution. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 123 S.Ct. 1513, 1519 (2003). Unique is seeking $479,873 in punitive damages which is twice the amount sought in compensatory damages. The court finds that Rosenberg committed gross fraud in his business dealings with Unique which warrants an award of $90,000 to Unique from Rosenberg in punitive damages.

19.     The Court hereby directs the Clerk to enter judgment in favor of Unique, and against GSA and Frank Rosenberg, jointly and severally, in the amount of $391,486.73. The Court also directs the Clerk to enter a Judgment of dismissal in favor of Unique and against GSA on GSA's counterclaims.

## MOTION FOR RULE 37 EXPENSES

Unique has filed a motion for expenses against Rosenberg. Pursuant to Federal Rule of Civil Procedure 36 a party can request an admission from another party. On July 31, 2001 Unique served requests for admissions on GSA and Rosenberg. On August 3, 2001 Rosenberg served his responses to Unique's request for admissions. Rosenberg denied the genuineness and/or substance of documents that were admitted without objection, or whose genuineness and/or substance was conclusively proved at trial. Rosenberg claims that he made a reasonable

inquiry before making his denials and that he had a reasonable basis to believe that he might prevail on the matters sought to be admitted. We do not agree. We find that, pursuant to Civil Rule of Civil Procedure 37(c)(2), it is appropriate to award to Unique from Rosenberg $13,207.50 for expenses.

## CONCLUSION

Based on the foregoing analysis, we find in favor of Unique on its breach of contract claim against GSA (Count I), its breach of contract claim against Rosenberg as the alter ego of GSA (Count II), and the fraud claim against Rosenberg (Count III). We hereby direct the Clerk to enter judgment in favor of Unique, and against GSA and Frank Rosenberg, jointly and severally, in the amount of $391,486.73. We also direct the Clerk to enter a Judgment of dismissal in favor of Unique and against GSA on GSA's counterclaims. In addition, we grant Unique's motion for Rule 37 expenses and award Unique $13,207.50 from Rosenberg.


Samuel Der-Yeghiayan
United States District Court Judge

Dated: Februaray 25, 2004